MCCLENDON, J.
The plaintiff appeals a trial court's judgment striking forty-six paragraphs and three subparagraphs from his eighty-eight paragraph petition for damages. He also appeals the two trial court's judgments *949 that granted the defendants' peremptory exceptions raising the objection of no cause of action, based on absolute immunity. For the reasons that follow, we reverse in part and affirm in part the judgment regarding the motion to strike. We affirm the judgment that found no cause of action against the defendant judges and reverse the judgment that found no cause of action against the defendant law clerk.
FACTUAL AND PROCEDURAL HISTORY
On July 22, 2015, the plaintiff, Stanley R. Palowsky, III, individually and on behalf of Alternative Environmental Solutions, Inc., filed a Petition for Damages against the defendant, Allyson Campbell, a law clerk for the Fourth Judicial District Court (Fourth JDC), asserting that Ms. Campbell maliciously and intentionally harmed Mr. Palowsky "when she spoliated, concealed, removed, destroyed, shredded, withheld, and/or improperly 'handled' court documents" in the matter entitled Palowsky v. Cork, Docket No. 13-2059, of the Fourth JDC. Thereafter, on July 31, 2015, Mr. Palowsky filed a First Supplemental, Amended, and Restated Petition for Damages, adding as defendants, Chief Judge H. Stephens Winters, Judge Carl V. Sharp, Judge J. Wilson Rambo, and Judge Frederic C. Amman, current Fourth JDC judges, and retired Judge Benjamin Jones, the current Fourth JDC administrator[1] (the Judges), asserting that they aided and abetted Ms. Campbell "by allowing her free rein to do as she pleased and then conspiring to conceal [Ms.] Campbell's acts." Subsequently, all the judges of the Fourth JDC recused themselves from the matter, and the Louisiana Supreme Court appointed retired Judge Jerome J. Barbera, III, as judge ad hoc to preside over the case.
In response to Mr. Palowsky's pleadings, Ms. Campbell and the Judges each filed a motion to strike specific paragraphs of Mr. Palowsky's petition and various exceptions, including the peremptory exception raising the objection of no cause of action based on judicial immunity.[2] On November 5, 2015, the trial court held a hearing on the motions to strike and the exceptions of no cause of action. The trial court first addressed the motions to strike and ordered that forty-six paragraphs and three subparagraphs of Mr. Palowsky's eighty-eight paragraph amended petition be stricken, finding them to be immaterial.[3] After granting the motions to strike, the trial court addressed the exceptions of no cause of action based on the remaining paragraphs of Mr. Palowsky's amended *950 petition. The trial court determined that the Judges and Ms. Campbell were entitled to absolute immunity for their alleged actions and granted the exceptions.
On December 11, 2015, the trial court signed a judgment regarding the motions to strike filed by Ms. Campbell and by the Judges. On that same date, the trial court also signed a judgment granting the exception of no cause of action in favor of Ms. Campbell and a judgment granting the exception of no cause of action in favor of the Judges, dismissing Mr. Palowsky's case against them with prejudice.
Mr. Palowsky filed an appeal of the three judgments with the Court of Appeal, Second Circuit, and seven of the judges of that court recused themselves. Therefore, on September 7, 2016, the Louisiana Supreme Court ordered the transfer of the appeal of the matter to the Court of Appeal, First Circuit.
ASSIGNMENTS OF ERROR
In his appeal, Mr. Palowsky has assigned the following as error:
A. The trial court erred by finding that forty-six paragraphs and three subparagraphs in Mr. Palowsky's amended petition were immaterial and granting the defendants' motions to strike same.
B. The trial court erred by finding that the Judges had absolute immunity from liability for their actions and thereby granting their exception of no cause of action.
C. The trial court erred by finding that Ms. Campbell had absolute immunity from liability for her actions and thereby granting her exception of no cause of action.
D. The trial court erred in refusing to give Mr. Palowsky the opportunity to amend his petition to state a cause of action.
THE MOTIONS TO STRIKE
Louisiana Code of Civil Procedure Article 964 provides:
The court on motion of a party or on its own motion may at any time and after a hearing order stricken from any pleading any insufficient demand or defense or any redundant, immaterial, impertinent, or scandalous matter.
The granting of a motion to strike pursuant to Louisiana Code of Civil Procedure article 964 rests in the sound discretion of the trial court and is reviewed under the abuse of discretion standard. Pitre v. Opelousas Gen. Hosp., 530 So.2d 1151, 1162 (La. 1988). See also Detillier v. Borne, 15-129 (La.App. 5 Cir. 9/23/15), 176 So.3d 669, 671. Motions to strike are viewed with disfavor and are infrequently granted. They are disfavored because striking a portion of a pleading is a drastic remedy, and because they are often sought by the movant simply as a dilatory tactic. However, a motion to strike is proper if it can be shown that the allegations being challenged are so unrelated to a plaintiff's claims as to be unworthy of any consideration and that their presence in the pleading would be prejudicial to the moving party. Carr v. Abel, 10-835 (La.App. 5 Cir. 3/29/11), 64 So.3d 292, 296, writ denied, 11-0860 (La. 6/3/11), 63 So.3d 1016. See also Smith v. Gautreau, 348 So.2d 720, 722 (La.App. 1 Cir. 1977). A motion to strike is a means of clearing up the pleadings, not a means of eliminating causes of action or substantive allegations. Hicks v. Steve R. Reich, Inc., 38,424 (La.App. 2 Cir. 5/12/04), 873 So.2d 849, 852 ; Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp., 01-0345 (La.App. 3 Cir. 6/20/01), 790 So.2d 93, 98.
Because the source of Article 964 is found in Rule 12(f) of the Federal Rules of Civil Procedure, we look to federal jurisprudence *951 to assist us in analyzing Article 964.[4] Smith, 348 So.2d at 722. The terms "redundant, immaterial, impertinent, or scandalous matter" have been defined in at least one federal case, Marceaux v. Lafayette Consol. Government, 6:12-01532 (W.D. La. 10/18/12), 2012 WL 5197667 (unpublished), wherein the court stated:
Redundant matter consists of allegations that constitute a needless repetition of other averments in the pleading. Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded. Immateriality is established by showing that the challenged allegations "can have no possible bearing upon the subject matter of the litigation." Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question; while scandalous matter is that which improperly casts a derogatory light on someone, most typically on a party to the action. "The granting of a motion to strike scandalous matter is aimed, in part, at avoiding prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegations any other unnecessary notoriety inasmuch as, once filed, pleadings generally are public documents and become generally available."
Id. (footnotes with citations omitted); see also Bayou Fleet Partnership, LLC v. St. Charles Parish, 10-1557 (E.D. La. 7/8/11), 2011 WL 2680686 (unpublished).
In this matter, Mr. Palowsky alleged that he is the fifty-percent shareholder and director of Alternative Environmental Solutions, Inc. (AESI). Mr. Palowsky also asserted that he filed suit against W. Brandon Cork, the other fifty-percent shareholder of AESI, for damages Mr. Palowsky suffered as a result of Mr. Cork's theft, fraud, racketeering, and breach of fiduciary duty.
In his original petition against only Ms. Campbell, Mr. Palowsky alleged that Ms. Campbell acted outside the course and scope of her employment to maliciously and intentionally harm Mr. Palowsky by allegedly destroying or withholding certain court filings. Mr. Palowsky's First Supplemental, Amended, and Restated Petition for Damages again stated that Ms. Campbell was acting outside the course and scope of her employment duties and added the Judges as defendants for allegedly "aiding and abetting [Ms.] Campbell by allowing her free rein to do as she pleased and then conspiring to conceal [Ms.] Campbell's acts." He did not allege any participation on the part of the Judges in the alleged destruction or withholding of court documents.
Ms. Campbell filed her motion to strike on August 10, 2015, and the Judges filed their motion on August 25, 2015,[5] in which the Judges and Ms. Campbell asserted that most of Mr. Palowsky's allegations of "fact" in his amended petition were included for no other purpose than to embarrass, harass, and unnecessarily criticize the defendants. The trial court, in its oral reasons, discussed the issues of immateriality and prejudice necessary for a motion to strike pursuant to LSA-C.C.P. art. 964. As to prejudice, the court stated:
[C]ertainly the allegations that have been made about the previous events that go back even the 2010 [event] involving *952 Ms. Campbell and then the other events that are alleged in the petition, the amended petition, about the actions and inactions of the judges certainly all of the information provided is prejudicial because it-it shows these parties to suggest to the reader that these parties are acting contrary to the ethics and responsibilities of their job and these allegations point to the reader that they've committed crime, and that they have acted badly, and that something should happen to them as a result of their activity. So there's no doubt that the allegations are prejudicial because anyone who would read that if they were convinced of the truth of it would form conclusions both about Ms. Campbell and the judges about their fitness and their ethics and their responsibility. Anyone who would read those allegations would certainly have questions about those things. So I don't think there's any doubt that the allegations that are at issue in the case are prejudicial.
Thereafter, the trial court addressed the second factor of "whether or not these allegations have any bearing on the subject matter of the litigation," which it framed as follows:
What this [amended] petition says is that Allyson Campbell, a law clerk to the judges of this district, an employee of the court, caused harm to the plaintiff by her actions in concealing, destroying, removing, withholding, and improperly handling, and I'm not quoting that verbatim, in improperly handling pleadings and court documents pertaining to civil litigation filed in this district by the plaintiff against a former business associate. So that's how I would sum up the cause of action by the plaintiff against Ms. Campbell. The petition also says that the named defendant judges are liable to the plaintiff for damages as a result of their aiding and abetting Ms. Campbell and conspiring to conceal her actions. So that's my summary of what this lawsuit is about.
The trial court then addressed the materiality of the allegations, finding a difference between materiality and admissible evidence at the trial of the matter, and stated:
[I]n looking at the other allegations of the petition that the defendants seek to strike it is evident to me that many of them are immaterial to the cause of action.... The question is, is whether or not they are material to the cause of action. And I made a determination that most of the [paragraphs] that are complained of are not material.
The court concluded that the following paragraphs of Mr. Palowsky's petition contained allegations that were immaterial to his lawsuit:
The court will strike Articles 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, paragraph A of 52, and paragraph C of 52, paragraph E of 52, 58, 59, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 79, 80, 81, and 82.
The paragraphs stricken included allegations of payroll irregularities and investigations, as well as assertions of payroll fraud by Ms. Campbell and a conspiracy to cover up the fraud by the Judges. More specifically, the petition asserted the existence of an investigation by the Louisiana Legislative Auditor into possible payroll fraud regarding some Fourth JDC employees being paid for hours that were not worked. Other paragraphs stricken as immaterial regarded the destruction or concealment of documents in other cases by Ms. Campbell and the subsequent knowledge by the Judges. Additionally, paragraphs detailing Ms. Campbell's personal *953 life and work habits were deleted by the trial court. Mr. Palowsky asserted that Ms. Campbell boasted in a local bar that she had shredded or withheld a court document in another case and that she had a weekly "society" column entitled, "A modern guide to handle your scandal," in which she made comments, such as, "I represent to you all the sins you have never had the courage to commit," and, "It's not cheating if it's in your favor."
While many of the stricken allegations in Mr. Palowsky's amended petition have nothing to do with his present lawsuit, some of the stricken paragraphs arguably show a prior history of concealment or destruction of court documents by Ms. Campbell. Particularly, Paragraphs 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, and 52C refer to the alleged destruction or concealment of court documents by Ms. Campbell in a case handled by another attorney in the Fourth JDC and the Judges' subsequent knowledge of same. Upon careful review of these allegations, and finding that they could have some bearing on the subject matter of the litigation, in that they allege a pattern of behavior by Ms. Campbell of destroying court documents, we cannot find that these paragraphs are immaterial to this matter. Therefore, we find that the trial court abused its discretion in striking Paragraphs 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, and 52C. Additionally, we find an abuse of discretion in striking Paragraphs 58, 61, 63, 68, 69, 71, 80, and 81 as they also refer to Ms. Campbell's pattern of behavior or willingness to act in such a manner.
Therefore, we reverse in part the December 11, 2015 judgment of the trial court insofar as it granted the motions to strike by the Judges and by Ms. Campbell with regard to Paragraphs 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 52C, 58, 61, 63, 68, 69, 71, 80, and 81 of Mr. Palowsky's amended petition, finding those paragraphs material to the instant matter. We find no abuse of discretion by the trial court in striking as immaterial Paragraphs 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 39, 42, 52A, 52E, 59, 62, 64, 65, 66, 67, 70, 79, and 82.
NO CAUSE OF ACTION
As used in the context of the peremptory exception, a "cause of action" refers to the operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant. Scheffler v. Adams and Reese, LLP, 06-1774 (La. 2/22/07), 950 So.2d 641, 646 ; Ramey v. DeCaire, 03-1299 (La. 3/19/04), 869 So.2d 114, 118. The purpose of the peremptory exception raising the objection of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the petition. Scheffler, 950 So.2d at 646 ; Ramey, 869 So.2d at 118. No evidence may be introduced to support or controvert the exception of no cause of action. LSA-C.C.P. art. 931. The exception is triable on the face of the pleadings, and, for purposes of resolving the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. Scheffler, 950 So.2d at 646 ; Fink v. Bryant, 01-0987 (La. 11/28/01), 801 So.2d 346, 349. The issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Scheffler, 950 So.2d at 646 ; Ramey, 869 So.2d at 118.
Louisiana retains a system of fact pleading, and mere conclusions of the plaintiff unsupported by facts will not set forth a cause or right of action. Scheffler, 950 So.2d at 646-47 ; Montalvo v. Sondes, 93-2813 (La. 5/23/94), 637 So.2d 127, 131. The burden of demonstrating that a petition fails to state a cause of *954 action is upon the mover. Scheffler, 950 So.2d at 647 ; Ramey, 869 So.2d at 119. Because the exception of no cause of action raises a question of law and the trial court's decision is based solely on the sufficiency of the petition, review of the trial court's ruling on an exception of no cause of action is de novo. Scheffler, 950 So.2d at 647 ; Fink, 801 So.2d at 349. The pertinent inquiry is whether, in the light most favorable to the plaintiff, and with every doubt resolved in the plaintiff's favor, the petition states any valid cause of action for relief. Scheffler, 950 So.2d at 647 ; Ramey, 869 So.2d at 119.
The doctrine of judicial immunity developed at common law as a shield intended to protect judges from civil suits for damages for actions taken in their judicial capacity. Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288, 294 (1967). The doctrine can be traced back to the successful efforts of the King's Bench to ensure the supremacy of the common-law courts. Pulliam v. Allen, 466 U.S. 522, 530, 104 S.Ct. 1970, 1974-75, 80 L.Ed.2d 565, 571 (1984). The fundamental policy principle underlying the doctrine of judicial immunity was reiterated by the United States Supreme Court in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646, 649 (1871), where the Court held that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." See also Estate of Sherman v. Almeida, 747 A.2d 470, 473-74 (R.I. 2000). The Supreme Court more recently observed that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." Cleavinger v. Saxner, 474 U.S. 193, 199, 106 S.Ct. 496, 499-500, 88 L.Ed.2d 507 (1985) (quoting Pierson v. Ray, 386 U.S. at 553-54, 87 S.Ct. at 1217 ).
Accordingly, a long line of Supreme Court cases acknowledge that, generally, a judge is immune from a suit for money damages. Mireles v. Waco, 502 U.S. 9, 9-10, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991) (citations omitted). Courts have consistently held that judicial immunity is an immunity from suit, not just the ultimate assessment of damages. Mireles, 502 U.S. at 11, 112 S.Ct. at 288 (citing Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ). In Pierson, the Supreme Court stated that judicial immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences. Pierson, 386 U.S. at 554, 87 S.Ct. at 1218. It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision making but to intimidation. Id. ;see also Oliva v. Heller, 839 F.2d 37, 39 (2nd Cir. 1988).
The Supreme Court again explained the purposes served by judicial immunity in Forrester v. White, 484 U.S. 219, 226-27, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988), stating that the nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have. If judges were personally liable for erroneous *955 decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication. Id.
There are only two circumstances under which judicial immunity may be overcome. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. Mireles, 502 U.S. at 11-12, 112 S.Ct. at 288. Allegations of bad faith or malice are not sufficient to overcome judicial immunity. Mireles, 502 U.S. at 11, 112 S.Ct. at 288. See also Kemp ex rel. Kemp v. Perkins, 324 Fed.Appx. 409, 411 (5th Cir. 2009) (unpublished).
"[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his [or her] judicial capacity." Mireles, 502 U.S. at 12, 112 S.Ct. at 288 (quoting Stump v. Sparkman, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978) ). The relevant inquiry is the nature and function of the act, not the act itself. In other words, a court should look to the particular act's relation to a general function normally performed by a judge. Mireles, 502 U.S. at 13, 112 S.Ct. at 288. The United States Fifth Circuit has adopted a four-factor test for determining whether a judge's actions are judicial in nature: (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity. Ballard v. Wall, 413 F.3d 510, 515 (5th Cir. 2005) (citing Malina v. Gonzales, 994 F.2d 1121, 1124 (5th Cir.1993) ); McAlester v. Brown, 469 F.2d 1280, 1282 (5th Cir. 1972). These factors are broadly construed in favor of immunity. Ballard, 413 F.3d at 515 ; Malina, 994 F.2d at 1124. See also Davis v. Tarrant County, Tex., 565 F.3d 214, 222-23 (5th Cir. 2009). Further, in some situations, immunity is to be afforded even though one or more of the four factors is not met. Malina, 994 F.2d at 1124.
"When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial," but "attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges" has proven to be a more difficult task. Forrester, 484 U.S. at 227, 108 S.Ct. at 544. Immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches. Id. The Supreme Court has forcefully indicated that the limits of judicial immunity are not to be set by subtle legalistic distinctions; rather, a broad functional approach is required: "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." Butz v. Economou, 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978) ; Holloway v. Walker, 765 F.2d 517, 524 (5th Cir. 1985).
In determining whether a judge is entitled to absolute immunity for a particular act, a court must also draw a "distinction *956 between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Forrester, 484 U.S. at 227, 108 S.Ct. at 544. See also Huminski v. Corsones, 396 F.3d 53, 75 (2nd Cir. 2005). Although administrative decisions "may be essential to the very functioning of the courts," such decisions have not been regarded as judicial acts. Forrester, 484 U.S. at 228, 108 S.Ct. at 544 ; Davis, 565 F.3d at 222.
Additionally, judicial immunity does not extend to acts committed with a clear absence of all jurisdiction. However, the term "jurisdiction" is to be broadly construed to effectuate the policies of guaranteeing a disinterested and independent judicial decision-making process. Stump, 435 U.S. at 356-57, 98 S.Ct. at 1105 ; Holloway, 765 F.2d at 523. Where a judge does not clearly lack all subject-matter jurisdiction, he does not clearly lack all jurisdiction, and "the same principle of exemption from liability which obtains for errors committed in the ordinary prosecution of a suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons." Bradley, 80 U.S. at 352 ; Holloway, 765 F.2d at 523.
Louisiana jurisprudence on judicial immunity mirrors the federal doctrine. Viator v. Miller, 04-1199 (La.App. 3 Cir. 4/27/05), 900 So.2d 1135, 1140 ; McCoy v. City of Monroe, 32,521 (La.App. 2 Cir. 12/8/99), 747 So.2d 1234, 1241, writ denied, 00-1280 (La. 3/30/01), 788 So.2d 441. Judges may not be cast for damages for their errors unless they have acted outside of their judicial capacity. It has long been held on the grounds of necessity and public policy that judges acting within the scope of their subject matter jurisdictions cannot be held liable for acts done in their judicial capacities. Knapper v. Connick, 96-0434 (La. 10/15/96), 681 So.2d 944, 946 ; Haley v. Leary, 09-1626 (La.App. 4 Cir. 8/4/10), 69 So.3d 430, 432-33, writ denied. 10-2265 (La. 12/17/10), 51 So.3d 14, cert. denied, 565 U.S. 820, 132 S.Ct. 104, 181 L.Ed.2d 32 (2011). The immunity is extended because of the function it protects rather than the title of the person who claims it. Absolute immunity attaches to all acts within a judge's jurisdiction, even if those acts can be shown to have been performed with malice, in order to insure that all judges will be free to fulfill their responsibilities without the threat of civil prosecution by disgruntled litigants. Knapper, 681 So.2d at 946 ; Haley, 69 So.3d at 433.
With regard to law clerks, a law clerk is probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function. Oliva, 839 F.2d at 40. A judicial opinion is not that of the law clerk, but of the judge. However, law clerks are closely connected with the court's decision-making process and are sounding boards for the judge's tentative opinions and legal researchers who seek the authorities that affect those decisions. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be. Moreover, the work done by law clerks is supervised, approved, and adopted by the judges who initially authorized it. Law clerks are essentially extensions of the judges at whose pleasure they serve. Therefore, a law clerk who is clearly assisting the judge in carrying out judicial functions is covered by the doctrine of absolute immunity. Id.See also Mitchell v. McBryde, 944 F.2d 229, 230 (5th Cir. 1991). Essentially, the immunity granted to the law clerk is derivative of the immunity afforded the judge and flows from that judicial immunity.
*957 In this matter, after granting the motions to strike, the trial court considered the exceptions of no cause of action filed by Ms. Campbell and by the Judges. The Judges and Ms. Campbell maintain that the trial court correctly granted the exceptions after finding that they were entitled to absolute immunity. In granting the exception of no cause of action filed by the Judges, the trial court stated:
There is no question in my mind that supervision and control of a law clerk employed by a district court is something that would be within the jurisdiction of a district court judge.... The judge has to decide what cases to give to the clerk. The judge has to decide what he wants the clerk to do with regard to those cases. That clerk might have other duties, but all of the duties of the clerk of course are what the judge decides they should be or not be. So there's no doubt that with regard to the actions of the judges in this case in their contact with and in their relationship as the employer of Ms. Campbell that their actions are within their jurisdiction. That other factor is whether the actions are judicial in nature is what is-seems to be the most [contentious] in this case.
The court then discussed the four factors used to determine if acts are judicial in nature, stating:
I've already stated in reference to the jurisdiction issue about whether or who is involved in the assignment of work and supervision of law clerks and certainly that is a normal judicial function, the supervision, management, assignment, and control of a law clerk is certainly a normal judicial function. There's no one else to perform that function. There's no one else that should perform that function. So number one is clearly satisfied. Number two, is whether the acts occurred in the courtroom or appropriate adjunct spaces.... [I]f there's a complaint that a judge failed to supervise or conspired in supervision or in concealing wrongful acts of a law clerk the question is not whether the judge's actions take him or her out of immunity because you don't examine the act itself. You examine the nature and function of it, and that is the contact between the judge and the law clerk which is a judicial function. So that's where the inquiry with regard to immunity ends. It's not with attempting to separate a particular act out; it's the nature and function of the act which in this case is the allegation that the judges in their role of supervision failed to act properly. Number three, whether this controversy centered around a case pending before the court? Well, there's no doubt about that. That's exactly what the petition is about. That all of this was done to the prejudice of Mr. Palowsky in the case of Pa l owsky versus Cork . That's what the case is about. So that factor is met. The fourth factor, whether the acts arose directly out of a visit to the judge in his official capacity? Those-that particular factor of course addresses issues or situations where a judge may have made a ruling in the courtroom that someone was aggrieved by. Circumstances don't always permit the application of that, and as Malina says in some situations and I'm quoting from the Malina case; immunity is to be afforded even though one or more of the McAlester factors is not met, and certainly that is the case here. Malina also reminds us that the concept of immunity is to be broadly construed in favor of granting immunity. The allegations of the petition against the judges clearly fall inside these factors, and the judges in this case are granted absolute immunity in the law for their alleged acts of wrongdoing.
*958 Then, in discussing whether Ms. Campbell was entitled to immunity, the trial court stated:
The question of whether a law clerk should be granted immunity is generally tied to the judge being granted immunity because they generally occur at the same time.... And what the courts say is that it doesn't make any sense to grant immunity to the judge and then leave the law clerk exposed to liability for being part of the same judicial process.... I recognize the difference in the facts of this case from the facts of most cases that you read about immunity of law clerks. As I said generally the judge gets sued, and when the judge gets sued you know the disgruntled litigant sues everybody that was involved in the process that he's disgruntled about. The difference in this case is that the lawsuit starts off against Ms. Campbell alleging that she committed wrongful acts with regard to Mr. Palowsky's case against Mr. Cork. The petition never alleges that Ms. Campbell took those actions at the direction of the judge, the judge assigned to the case or any other judge. Never says that. And then the amending petition adds the judges as conspirators and enablers. So it's in a factual basis chronologically it's not what you see in most of the other cases. But there is no distinction in the way that the actions of Ms. Campbell-there is no distinction in the application of immunity to the facts of this case, as alleged. There is no reason why I would be directed in another direction to apply the law of immunity to Ms. Campbell in this case because of the chronology of what the plaintiff says happened or didn't happen. Her actions, alleged actions, regarding mishandling and destroying documents in the plaintiff's lawsuit are nonetheless actions involving a pending case in the judicial process. So she under the law is entitled to absolute immunity as directed by the cases and by the body of jurisprudence that governs this concept.
Upon our de novo review, after carefully considering the applicable law and jurisprudence, in light of the underlying purpose of the judicial immunity doctrine, we conclude that Mr. Palowsky has stated a cause of action against Ms. Campbell. As previously stated, a law clerk's actions in assisting a judge to carry out judicial functions are covered by the doctrine of absolute immunity. The review, handling, and consideration of the record are all part of the judicial process. However, that immunity cannot extend to the independent act by a law clerk of intentionally destroying documents or withholding documents from the judge or jury without the judge's knowledge. The intentional destruction or concealment of court documents that was not at the direction or instruction of a judge, as alleged herein, is not part of the adjudicative process. Rather, it is the antithesis of the judicial function. Mr. Palowsky asserts that Ms. Campbell was "uncontrollable for years" and acting independently outside the scope of her judicial functions as an employee of the court. As alleged, Ms. Campbell was neither assisting the Judges in carrying out judicial functions nor acting at the direction of any judge and was acting in the clear absence of all jurisdiction. See Oliva, 839 F.2d at 40. Therefore, we conclude that Mr. Palowsky has stated a cause of action against Ms. Campbell insofar as he has asserted the intentional concealment or destruction of documents from the court outside of any directive from a judge, and we reverse the December 11, 2015 judgment that sustained Ms. Campbell's exception of no cause of action to the extent that it finds Ms. Campbell absolutely *959 immune for the intentional destruction of court documents.
As to the Judges, we conclude that they have absolute judicial immunity from Mr. Palowsky's lawsuit. The allegations directed to the Judges in Mr. Palowsky's First Supplemental, Amended, and Restated Petition for Damages do not deprive them of judicial immunity. This immunity applies, "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." Cleavinger, 474 U.S. at 199-200, 106 S.Ct. at 500 (quoting Bradley, 80 U.S. at 347 ). See also Mitchell, 944 F.2d at 230. Indeed, where a court has some subject-matter jurisdiction, there is sufficient jurisdiction for immunity purposes. Kemp ex rel. Kemp, 324 Fed.Appx. at 412. There is a meaningful distinction between judicial acts which occur in excess of jurisdiction, which receive judicial immunity, and those which take place wholly lacking jurisdiction, which do not. Id. at 412-13. As to the allegations against the Judges, even were they acting in excess of jurisdiction, they were not acting in the clear absence of jurisdiction. The Supreme Court has explained that "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' " Stump, 435 U.S. at 356-57, 98 S.Ct. at 1105 (quoting Bradley, 80 U.S. at 351 ).
Moreover, the actions or inactions of the Judges, in allegedly conspiring to conceal the actions of Ms. Campbell, would have been taken in their judicial capacity in working and interacting with Ms. Campbell within the parameters of the judicial process. There are no allegations of participation by the Judges in the destruction of documents and only allegations of knowledge by the Judges of the destruction of documents after the fact. The allegations against the Judges amount to a failure to properly supervise Ms. Campbell in the handling of cases before the court and the failure to reveal her actions once discovered. Looking at the nature and function of the actions of the Judges, and not the acts themselves, the Judges' actions encompass the supervision of and working with a law clerk on cases before them.[6] Accordingly, we cannot find error and affirm the December 11, 2015 judgment of the trial court that sustained the Judges' exception of no cause of action and dismissed all claims against the Judges with prejudice.[7]
CONCLUSION
For the above and foregoing reasons, we reverse in part the December 11, 2015 judgment of the trial court insofar as it granted the motions to strike by the Judges and by Ms. Campbell with regard to Paragraphs 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 52C, 58, 61, 63, 68, 69, 71, 80, and 81 of Mr. Palowsky's amended petition. We affirm the judgment striking Paragraphs 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 39, 42, 52A, 52E, 59, 62, 64, 65, 66, 67, 70, 79, and 82. We also affirm the December 11, 2015 judgment of the trial court that sustained the Judges'
*960 peremptory exception raising the objection of no cause of action and dismissed all claims against the Judges with prejudice. Lastly, we reverse the December 11, 2015 judgment that sustained Ms. Campbell's peremptory exception raising the objection of no cause of action to the extent that it finds Ms. Campbell absolutely immune for the intentional destruction of court documents. Costs of this appeal shall be shared one-half by the plaintiff, Stanley R. Palowsky, III, individually and on behalf of Alternative Environmental Solutions, Inc., and one-half by the defendant, Allyson Campbell, and the defendants, Chief Judge H. Stephens Winters, Judge Carl V. Sharp, Judge J. Wilson Rambo, Judge Frederic C. Amman, and Judge Benjamin Jones.
DECEMBER 11, 2015 JUDGMENT ON MOTIONS TO STRIKE REVERSED IN PART AND AFFIRMED IN PART; DECEMBER 11, 2015 JUDGMENT DISMISSING DEFENDANT JUDGES AFFIRMED; DECEMBER 11, 2015 JUDGMENT DISMISSING DEFENDANT CAMPBELL REVERSED.
Higginbotham, J. concurs in part and dissents in part for reasons assigned by Chief Judge Whipple.
Welch, J. concurs in part and dissents in part for reasons assigned by J. Whipple.
Whipple, C.J. concurs in part and dissents in part for reasons assigned.
Pettigrew, J. concurs
Penzato, J. concurs
Guidry, J. concurs
Chutz, J. concurs
Crain, J. dissents and assigns reasons
Holdridge J., concurs in part and dissents in part for reasons assigned by C.J. Whipple assigns additional reason
Attachment *961 ATTACHMENT A
STATE OF LOUISIANA PARISH OF OUACHITA FOURTH DISTRICT COURT STANLEY R. PALOWSKY, III, Individually, FILED: JUL 31 2015 and on behalf of ALTERNATIVE ENVIRONMENTAL SOLUTIONS, INC. VERSUS NO. 15-2179 ALLYSON CAMPBELL DY. CLERK OF COURT
FIRST SUPPLEMENTAL, AMENDED, AND RESTATED PETITION FOR DAMAGES
NOW INTO COURT, through undersigned counsel, comes Plaintiff, Stanley R. Palowsky, III, who appears herein individually and as a 50-percent shareholder and director of Alternative Environmental Solutions, Inc. ("AESI"), a Louisiana corporation, and who submits his First Supplemental, Amended, and Restated Petition for Damages, without leave of Court as the originally-named defendant has not yet filed responsive pleadings, as follows:
1.
Made defendants herein are the following individuals:
A. Allyson Campbell, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana;
B. Chief Judge H. Stephens Winters, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana;
C. Judge Carl V. Sharp, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana;
D. Judge Benjamin Jones, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana;
E. Judge J. Wilson Rambo, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana; and
F. Judge Frederic C. Amman, an individual of the full age of majority and a resident and domiciliary of the Parish of Ouachita, State of Louisiana.
*962 2.
Pursuant to Louisiana Code of Civil Procedure article 615, made nominal defendant herein is AESI. Palowsky states that it would be a vain and useless act for him to demand that AESI bring the present action as the other 50-percent shareholder of AESI is W. Brandon Cork, who, as discussed below, has been sued by Palowsky in a related action.
3.
At all pertinent times, Defendant Campbell was acting under color of law but outside the course and scope of her employment duties as a non-attorney law clerk for the Fourth Judicial District Court ("Fourth JDC").
4.
At all pertinent times through December 2014, Defendant Jones was employed as a duly-elected judge of the Fourth JDC sworn to uphold the laws and Constitution of this State and abide by the Code of Judicial Conduct. Since March 2015, he has been employed as the Judicial Administrator of the Fourth JDC, a position for which he receives state monies in addition to his retirement funds to perform administrative tasks and act as a "supernumerary" judge.
5.
At all pertinent times, Defendants Winters, Sharp, Rambo, and Amman were employed as duly-elected judges of the Fourth JDC sworn to uphold the laws and Constitution of this State and abide by the Code of Judicial Conduct.
6.
Defendants Winters, Sharp, Jones, Rambo, and Amman (collectively referred to as "Defendant Judges") were acting under color of law but were acting in an administrative capacity when they committed the acts and/or omissions set forth herein; therefore, they are not entitled to judicial immunity from liability arising from same.
7.
As set forth below, Defendant Campbell is liable to Palowsky for the damages he has suffered as the result of her fraud, conspiracy to commit fraud, abuse of process, destruction or concealment of public records, intentional infliction of emotional distress, and violation of his rights under the Louisiana Constitution to due process and access to courts. Defendant Judges *963 are liable in solido to Palowsky for damages he has suffered as the result of their aiding and abetting Campbell by allowing her free rein to do as she pleased and then conspiring to conceal Campbell's acts which compounded the adverse effects of her acts on Palowsky.
8.
Palowsky submits first, though, that his allegations against Defendants must be viewed in light of other actions they have taken in recent years.
Campbell's History of Payroll Fraud and Defendant Judges' Complicit Cover-Up of Same
9.
Defendant Campbell is the highest paid law clerk in the Fourth JDC even though she is the only Fourth JDC law clerk who is not a licensed attorney and even though there is at least one law clerk who has been employed there longer than she has been.
10.
Upon information and belief, Campbell has not been to a continuing legal education course since graduating from law school in Alabama 15 years ago. Instead, she apparently receives continuous on-the-job training from different judges.
11.
On March 3, 2015, The News-Star reported that the Louisiana Legislative Auditor had issued a report indicating that some Fourth JDC employees might have been paid for hours which were not worked. In other words, payroll fraud had probably been committed.
12.
Defendant Campbell was apparently the only subject of the Auditor's report on suspected payroll fraud.
13.
Upon information and belief, unlike all other law clerks employed by the Fourth JDC, Campbell reportedly did not electronically enter the time she spent at work until after May 2014, a month she "unexpectedly" had off without pay. Furthermore, her office reportedly went vacant for days, if not weeks, at a time.
*964 14.
Moreover, Campbell has posted several pictures on her Facebook page which were viewable by the public[8] and which indicated that she not only did her job in restaurants and/or bars, but also that she drank alcohol while doing so. For example, she captioned one picture, which was obviously taken in a restaurant and which showed food and alcoholic beverages, "Seafood nachos at the office." She then posted a picture from the same restaurant of her half-eaten meal and two empty glasses and commented, "Too many house hooker drinks."
15.
Notably, Defendants Amman, Sharp, and Rambo, along with Judge B. Scott Leehy, certified Campbell's time sheets and records for state payroll.
16.
Defendant Judges all owe an administrative duty to properly audit, investigate, and report suspected payroll fraud.
17.
As Chief Judge, Defendant Winters' present administrative duties and responsibilities include the proper auditing, investigating, and reporting of any suspected payroll fraud.
18.
Nonetheless, Defendant Judges have not only allowed Campbell to commit payroll fraud, but they have also actively schemed to cover up same.
19.
As just one example, Defendant Winters filed suit number 15-0770 on March 20, 2015, against Hanna Media Inc., d/b/a/ The Ouachita Citizen newspaper, after it filed a criminal complaint against the Court over public records requests dealing with the Court's internal investigations of possible payroll fraud involving Campbell as well as her felonious destruction of court documents, which is discussed below.
*965 20.
In that suit, the Court argued that Campbell's right to privacy with regard to her employment file was stronger than the public's right to know if its tax funds were being used to pay someone who was committing, or allegedly committing, payroll fraud. Campbell intervened in that suit and, thereby, became a party to the litigation.
21.
Even though the Legislative Auditor had reported that some court employees might have been paid for hours which they did not work, and even though Campbell had posted pictures on her Facebook page which indicated that she was eating and drinking alcohol at her "office," i.e., restaurants or bars, Defendant Winters, on behalf of the Court, stridently protected Campbell's privacy "rights" and deprived the public of the opportunity to learn whether they were paying her to "work" while she was out of the office eating and drinking alcohol.
22.
Additionally, in that same litigation, a draft judgment which was unsigned, undated, and unfiled in the suit record was somehow received and circulated by and between Campbell, a party litigant, and Defendant Jones more than one week in advance of any signed and dated judgment or reasons for judgment being made available to the public or to the defendant therein.
23.
In an interview with The Ouachita Citizen, Judge Jones admitted the impropriety of having an unsigned and undated draft of a judgment before same is released to all parties in the litigation, but he refused to state from whom he obtained such document and, more disturbingly, when it was obtained.
24.
Upon information, Defendant Campbell had two deputy clerks of court aiding and abetting her document destruction, removal, and/or mishandling.
25.
Palowsky avers that Defendants Jones and Campbell were clandestinely working to improperly obtain ex parté the judgment of the ad hoc judge assigned to hear Defendant Winters' lawsuit, if not to actually help influence and/or draft the judgment.
*966 26.
Given these facts, Palowsky submits that not only were Defendant Judges complicit in Defendant Campbell's payroll fraud, but they also schemed and conspired with her to conceal the fraud from the tax-paying public.
Campbell's History of Destruction, Mishandling, and/or Concealment of Documents and Defendant Judges' Complicit Cover-Up of Same
27.
Defendant Judges all owe an administrative duty to properly audit, investigate, and report suspected document destruction, concealment, and/or mishandling. As Chief Judge, Defendant Winters' present administrative duties and responsibilities include the proper auditing, investigating, and reporting of any suspected document destruction, concealment, and/or mishandling.
28.
In addition to having a history of committing payroll fraud, Campbell also has a history of destroying and/or concealing court documents, and Defendant Judges have covered this up to protect Campbell.
29.
For example, in 2012, Monroe attorney Cody Rials complained to Defendant Sharp that Campbell had withheld and/or shredded his court document in a case that was pending before said judge.
30.
Upon information and belief, the investigation of Campbell's suspected felonious conduct was assigned to Defendant Sharp, who, upon information and belief, interviewed an eyewitness who confirmed that he observed Campbell bragging in a local bar that she had destroyed Rials' court document. Nevertheless, Sharp, who found the eyewitness to be credible, refused to investigate further, and he shut the investigation down.
31.
Thus, in 2012, Defendant Sharp covered up Campbell's destruction of Rials' document and remained silent as to same.
*967 32.
In 2014, when Defendant Campbell wrote "A modern guide to handle your scandal," one of her weekly "society" columns in The News-Star, Rials believed that Campbell was goading him and gloating over the fact that she had gotten away with destroying his document. As a result, he wrote to court personnel to again complain about Campbell's actions.
33.
Upon information and belief, Rials was then ordered to reduce his complaint of such felonious conduct to writing, which he did. The Court then appointed Defendant Jones to investigate, which is a purely administrative task, Rials' complaint of Campbell's felonious misconduct.
34.
It is believed that during the investigation, Defendants Sharp and Jones interviewed an unbiased disinterested witness who personally saw and heard Campbell sitting in a bar boasting about shredding Rials' document so that Sharp could not review it.
35.
Once the eyewitness, a local attorney, was interviewed and found credible, the "investigation" was closed and the cover up began yet again.
36.
No official Fourth JDC records of the investigation are believed to have survived Defendant Jones' retirement at the end of 2014. In fact, Defendants Winters and Jones advised The Ouachita Citizen that there were no discipline records involving Campbell which the Court could provide in response to the newspaper's request for public records in March 2015.
37.
Further, during the trial of the Court's suit against The Ouachita Citizen, counsel for the Court argued to the ad hoc judge that there was no "eyewitness" testimony to Campbell's alleged felonious destruction of court documents.
38.
Perhaps more importantly, although the Court admitted that it had Rials' written complaint, it argued that Campbell's destruction of court documents was a mere "personnel *968 matter," and that Campbell's privacy rights outweighed the tax-paying public's right to know whether a Court employee was destroying documents.
39.
Additionally, upon information and belief, when the Clerk of Court could not locate 52 writ applications which had been "missing" for over a year, it was discovered that Campbell, who was clerking for Defendant Sharp at the time, had used the applications as an end table in her office. Nonetheless, it does not appear that she was ever reprimanded, much less punished, for same.
40.
Thus, Palowsky submits that not only were Defendant Judges complicit in Defendant Campbell's felonious destruction of documents, but they also schemed and conspired with her to cover up same from the tax-paying public and from litigants and their counsel. Defendant Judges' affirmative acts to cover up Campbell's felonious conduct amounts to misprision of a felony.
41.
Defendants' Actions in Palowsky v. Cork
41.
At all times pertinent to his causes of action against Defendants, Palowsky and AESI, derivatively, have been plaintiffs in the matter of Palowsky v. Cork, et al, Docket No. 13-2059 of the Fourth JDC.
42.
After the missing 52 writ applications were found in Campbell's office, she was reassigned to Defendant Amman, who is her close friend and personal confidant, and Defendant Rambo, who was presiding over Palowsky's suit against Cork at the time.
43.
This re-assignment led to Palowsky's becoming the most recent victim of Defendant Campbell's malicious and intentional destruction of documents and Defendant Judges' cover up of same.
*969 44.
In Palowsky v. Cork, Plaintiff filed suit against W. Brandon Cork, the other 50-percent shareholder of AESI, for damages he suffered as a result of Cork's theft, fraud, racketeering, and breach of fiduciary duty, the latter of which Cork testified was done, at least in part, at the direction of his counsel therein.[9]
45.
Upon information and belief, Defendant Campbell maliciously and intentionally harmed Palowsky and willfully violated his constitutionally-protected rights to both due process[10] and access to courts[11] in Palowsky v. Cork when she spoliated, concealed, removed, destroyed, shredded, withheld, and/or improperly "handled" court documents such as memoranda of law, orders, pleadings, sealed court documents, and chamber copies of pleadings filed with the clerk and hand-delivered to Defendant Rambo's office.
46.
Upon information and belief, Defendant Campbell maliciously withheld and concealed documents and pleadings in the trial court as well as from the record that was sent to the Second Circuit Court of Appeal for its review of an application for supervisory writs filed by Cork. Said documents include the following:
A. Plaintiff AESI's Opposition to W. Brandon Cork's Motion to Strike Answer filed January 13, 2014. Notably, Defendant Rambo stated at the beginning of the hearing on the motion to strike that he had this pleading, yet it has remained "missing" from the record.
B. Plaintiff's Memorandum in Support of his Motion to Clarify Protective Order filed March 14, 2014. While the motion itself is included in the record, the supporting memorandum (with attached exhibits) was not in the record or in an envelope of sealed exhibits sent to the Second Circuit.
*970 C. AESI's Reply Memorandum to Clarify Language in Protective Order to Allow Proper Reporting of Crimes, Tax Fraud, Racketeering, and Conspiracy filed June 24, 2014, with attached correspondence among counsel for the respective parties.
D. AESI's Original Opposition to Writ Application of W. Brandon Cork filed on or about July 15, 2014. For some reason, this pleading was missing from the Second Circuit's record, which was prepared by the trial court, though Cork's application filed June 18, 2014, was included in the envelope of sealed documents filed with the appellate court.
E. Third Amending and Supplemental Petition of Plaintiff, Stanley R. Palowsky, III, and Third Party Demand of Defendant, Alternative Environmental Solutions, Inc., with attached order requesting leave to file same filed on August 13, 2014.[12] Although this pleading itself was missing from the record sent to the Second Circuit, Cork's memorandum in opposition to same was not.
F. Palowsky's and AESI's Memorandum in Support of Motion to Recuse Judge Rambo as well as exhibits attached to same. This pleading is discussed more specifically below.[13]
47.
Notably, such actions should constitute a violation of La. R.S. 14:132, the criminal statute which addresses the destruction or alteration of public records and sets forth the punishment for same.
48.
As set forth above, such actions by Campbell of repeatedly and maliciously withholding and concealing "missing" court documents were part of a proven pattern of misconduct outside the course and scope of her duties as a law clerk but under color of law.
*971 49.
Palowsky avers that Campbell undertook these acts with malice and with the intention not only to cause him loss and to injure and inconvenience him, but also to obtain unjust advantages for his opponent(s) and their counsel. At the very least, these actions constitute fraud per Louisiana Civil Code article 1953.
50.
Campbell's supervising judges at the time, Defendants Amman and Rambo, did not just sit back quietly and let Campbell commit such acts, they actively worked and schemed to cover up her actions.
51.
Additionally, Defendants Rambo, Jones, Sharp, and Winters have repeatedly denied that any documents were missing from the record of Palowsky v. Cork, but Palowsky has proven otherwise.
52.
Plaintiff was forced to file a motion to recuse Defendant Rambo in his suit against Cork after the following significant events involving Campbell, Defendant Rambo's law clerk at the time, occurred:
A. Campbell published and declared in the Sunday edition of the Monroe newspaper The News-Star her bias, favoritism, and praise for Cork's counsel Thomas M. Hayes, III, when she wrote in her weekly "society" column that he, as well as Judge D. Milton Moore, III, of the Second Circuit Court of Appeal, had the "IT" factor, "a somewhat undefinable quality that makes you and everyone else around stand taller when they enter the room, listen a little more closely, encourage you to take fashion or life risks, make each occasion a little more fun, and generally inspire you to aim to achieve that `IT' factor for yourself."
B. Many of Palowsky's filings went missing from the record and/or were withheld from Judge Rambo in status conferences and hearings as noted above.
C. Palowsky learned that Campbell had been investigated in 2012 by Defendant Sharp and again in 2014 by Defendants Sharp and Jones for destruction of Cody *972 Rials' court document as stated above. Even though Campbell's conduct had been corroborated by an eyewitness interviewed by Defendant Sharp who stated that Campbell boasted in a local bar that she had, indeed, shredded or withheld a court document in order to cause loss, injury, or inconvenience to attorney Rials, Defendant Judges refused to do anything to control, much less punish, Campbell. This showed Palowsky that Campbell had aptly demonstrated that she was beyond supervision, let alone discipline, and furthermore that Defendant Judges were covering up her actions.
D. In 2014, Defendant Jones was appointed to investigate complaints that Campbell was improperly "handling" Palowsky's filings. Defendant Jones concluded that the missing documents resulted from nothing more than delays caused by a new "filing process" in the Clerk's office. Nevertheless, the Clerk of Court advised counsel for Palowsky that the new "filing process" referenced by Defendant Jones did not exist.
E. Also in 2014, Campbell published the above-mentioned column entitled "A modern guide to handle your scandal" declaring that "half the fun is getting there, and the other half is in the fix...." She went on to advise her readers as follows:
[F]or the more adventurous among us, keep the crowd guessing. Send it out - lies, half truths, gorilla dust, whatever you've got.... [Y]ou are on the receiving end of one of the highest forms of flattery, as we always say "you're no one until someone is out to get you." That special somebody cared enough to try and blacken your reputation and went and turned you into a household name? Bravo. You're doing something right.
53.
After having so many of his pleadings vanish, after learning that Defendants Jones and Sharp had covered up Campbell's destruction of documents in another case, and after reading in black and white that Defendant Rambo's law clerk publicly and proudly advocated lying as a way to deal with a "scandal," Palowsky realized that he could not have Campbell or Defendant Rambo, for whom she worked and who allowed her to publish such "advice," handle his case if he wanted it done fairly.
*973 54.
Palowsky filed the motion to recuse Defendant Rambo to escape recurring abuses of process, bias, prejudice, and the problem of his pleadings frequently disappearing. In compliance with this Court's local rules, Palowsky contemporaneously filed a supporting memorandum with the Clerk of Court detailing the facts and circumstances, including Campbell's actions, which justified his recusal request. Moreover, counsel hand delivered a copy of same to Judge Rambo's chambers.
55.
Shortly after the recusal motion and memorandum were filed, Defendant Rambo held a status conference wherein he expressed his extreme displeasure to Plaintiff's counsel that Plaintiff had filed a motion to recuse without a supporting memorandum. Counsel for AESI and Palowsky advised Defendant Rambo that was exactly why they were asking him to recuse himself, i.e., because their filings were obviously being intercepted before he could read them.
56.
Obviously Defendant Campbell had, once again, acted outside the course and scope of her employment to intentionally harm Palowsky by withholding and/or concealing court documents and wrongfully thwarting his constitutional rights to due process and access to courts.
57.
After Palowsky and AESI suffered harm which was intentionally and maliciously inflicted upon them in Defendant Rambo's court for more than two years by Campbell in her efforts to damage them and to assist their opponents and their counsel, Defendant Rambo, while denying bias, recused himself without a hearing. Palowsky's case was then assigned to Defendant Sharp.
58.
Palowsky then filed a motion to recuse the Fourth JDC judges en banc on the basis that Campbell and the Court had become inextricably intertwined in litigation when Defendant Winters, on behalf of all the judges, filed suit against The Ouachita Citizen to protect Defendant Campbell's alleged privacy rights as discussed in paragraphs 18 through 26 above.
*974 59.
Palowsky's motion to recuse has recently been set for hearing in front of Defendant Sharp on August 20, 2015; however, he has informed all counsel in writing that he is not going to allow any testimony to be submitted during that hearing. Such refusal to hear evidentiary testimony is a clear violation of Palowsky's rights of due process and meaningful access to courts and is being done for the sole purpose of continuing the cover up.
60.
Palowsky avers that Defendant Judges' actions have been undertaken to cover up Campbell's misdeeds and felonious acts and to prevent any testimony or evidence of same from becoming part of the record in his litigation.
61.
Palowsky submits that his allegations against Campbell and Defendant Judges must be viewed in light of other actions she has taken during her employment and the judges' concealing of same all as set forth above in paragraphs 9 through 40.
62.
Palowsky also submits that his allegations must be considered in light of Defendant Campbell's personal philosophies on life which she has smugly published in her weekly "society" column during his litigation and which might lead one to believe that she is, to put it mildly, narcissistic and incapable of submitting to any authority.
63.
For example, on May 31, 2015, she wrote, "You will always be fond of me. I represent to you all the sins you have never had the courage to commit," a quote which she attributed to Oscar Wilde before he was imprisoned.
64.
On February 15, 2015, she quoted Oscar Wilde again when she said that "to love oneself is the beginning of a lifelong romance."
*975 65.
On April 5, 2015, she told her readers as follows: "I say live life to the fullest, follow no one's rules except your own (and law enforcement, of course) and continue to excel at your own personal spectacular talents."
66.
On April 12, 2015, she ended her column by quoting Henry Rollins: "In winter, I plot and plan. In spring, I move."
67.
On June 14, 2015, Campbell again cited Oscar Wilde and stated, "Consistency is the last refuge of the unimaginative." She then described how she "concocted ... a faux rom-com worthy `don't leave me' airport scene," and she professed, "goodness, I love attention." She then closed her column with W. David Johansen's words "I am doing exactly what I want to do, and I am having fun doing it."
68.
On June 21, 2015, Campbell wrote, "Escape the ordinary. Almost anything is possible if you have enough time and enough nerve."
69.
On July 12, 2015, she penned, "It's not cheating if it's in our favor."
70.
In another blatant display of narcissism, when Campbell's alleged improprieties and the litigation between the Court and The Ouachita Citizen were reported on by The Acadiana Advocate, Campbell posted a comment on the paper's online site and stated as follows: "Dear advocate [sic]: first of all my name is spelled Allyson, not Allison." She then went on to explain the role of an ad hoc judge.
71.
Palowsky notes that by allowing Campbell to write her weekly "society" column in which she has published articles which clearly show her admiration for Palowsky's opponent's attorney Hayes, by failing to properly supervise her, and by allowing, either directly or indirectly, her to withhold court documents in order to delay proceedings and harm Palowsky, *976 Defendants Rambo, Amman, Winters, Jones, and Sharp have violated multiple Canons of the Code of Judicial Conduct.
72.
For example, Canon 3(A)(3) requires that a judge have his staff be "patient, dignified, and courteous" to litigants and lawyers.
73.
Canon 3(A)(4) states that a judge shall not permit his staff to "manifest bias or prejudice" through "conduct or words."
74.
Canon 3(A)(8) prohibits a judge and his personnel from "mak[ing] any public comment that might reasonably be expected to affect [a pending proceeding's] outcome or impair its fairness...."
75.
Canon 3(B)(2) states that a "judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties."
76.
Palowsky notes that Article V, § 25(C) of the Louisiana Constitution provides in pertinent part as follows:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
77.
Regardless of Defendant Campbell's writings in her society column, Palowsky states that her actions of improperly handling pleadings and filings appear to be not only habitual, but also, at the very least, to be tacitly approved by Defendant Judges as she has apparently never even been reprimanded, much less disciplined, for same by any of them.
*977 78.
It is more likely, though, that Campbell's actions have been purposely concealed by Defendant Judges in a scheme to maliciously defraud and harm Palowsky and deprive him of his constitutional rights to due process and access to courts.
Recusal of All Judges of This Court
79.
Palowsky avers that all the judges of the Fourth JDC should recuse themselves from this matter since Defendants are employees of the Court.
80.
Moreover, as discussed above, this Court, through Defendant Judges, has an apparent history of protecting Campbell even though several attorneys in different cases, including Palowsky v. Cork, have complained about her suspected felonious destruction of documents and even though she has reportedly been investigated for public payroll fraud.
81.
Not only has this Court allowed Campbell to do as she pleases at the courthouse without recourse, but as noted above, it chose to sue a local newspaper to protect her employment records from being made public, and therein, it denied that there were any eyewitnesses to Campbell's destruction of documents even though Defendants Jones and Sharp reportedly interviewed an eyewitness who personally heard Campbell bragging about same.
82.
The above facts and circumstances require that the Fourth JDC be recused en banc and an ad hoc judge be appointed to hear and decide the instant lawsuit.
Requests for Relief
83.
To date, Plaintiff has endured more than two years of needless delay, court costs, attorney fees, embarrassment, mental stress, and inconvenience (as referred to in Civil Code article 1953) and has, likewise, been denied his constitutional rights to due process of law and access to courts as a result of Campbell's pattern of malicious and intentional misconduct and Defendant Judges' complicity in same.
*978 84.
Campbell's wrongdoings have been reported time and again by different attorneys in different cases and investigated time and again by Defendant Judges but have nevertheless been allowed to continue. It is now painfully apparent that not only has Campbell been unsupervised and uncontrollable for years, but Defendant Judges have actively schemed to allow her conduct to continue unabatedly.
85.
Palowsky avers that Campbell's and Defendant Judges' actions constitute fraud, conspiracy to commit fraud, abuse of process, destruction or concealment of public records, misprision of felonies, intentional infliction of emotional distress, and violation of his rights under the Louisiana Constitution to due process and access to courts.
86.
Palowsky therefore states that he, individually and on behalf of AESI, is entitled to be compensated for any and all damages that he and AESI have suffered as the result of Defendants' fraud, conspiracy to commit fraud, abuse of process, destruction or concealment of public records, misprision of felonies, intentional infliction of emotional distress, and violation of his Louisiana constitutional rights to due process and access to courts.
87.
At this time, Plaintiff seeks no relief under any federal law.
88.
Palowsky hereby requests a trial by jury on all his claims, including without limitation, his intentional tort claim.
WHEREFORE, Plaintiff, Stanley R. Palowsky, III, individually and on behalf of AESI, prays that after due proceedings are had, there be judgment rendered herein in favor of Plaintiff and against Defendants, Allyson Campbell, Judge H. Stephens Winters, Judge Carl V. Sharp, Judge Benjamin Jones, Judge J. Wilson Rambo, and Judge Frederic C. Amman, for all sums as are fair and just under the circumstances, together with reasonable attorney fees and court costs.
Plaintiff further prays for all orders and decrees necessary and proper under the premises and for full, general, and equitable relief.
*979 Respectfully submitted: SEDRIC E. BANKS #2730 Attorney at Law 1038 North Ninth Street Monroe, La. 71201 318-388-1655 telephone 318-388-0227 facsimile -and- Joseph R. Ward, Jr. # 8166 Ward & Condrey 206 North Jefferson Ave. Covington, La. 70433 985-871-5231 telephone 985-871-5324 facsimile Attorneys for Plaintiff, Stanley R. Palowsky, III PLEASE PERSONALLY SERVE: ALLYSON CAMPBELL 300 St. John St. Monroe, LA 71201 PLEASE SERVE: ALTERNATIVE ENVIRONMENTAL SOLUTIONS, INC., Through its agent for service of process: Sedric E. Banks 1038 North Ninth St. Monroe, LA 71201 PLEASE PERSONALLY SERVE the Original Petition for Damages and the First Supplemental, Amended, and Restated Petition for Damages on CHIEF JUDGE H. STEPHENS WINTERS 300 St. John St. Monroe, LA 71201 PLEASE PERSONALLY SERVE the Original Petition for Damages and the First Supplemental, Amended, and Restated Petition for Damages on JUDGE CARL V. SHARP 300 St. John St. Monroe, LA 71201 PLEASE PERSONALLY SERVE the Original Petition for Damages and the First Supplemental, Amended, and Restated Petition for Damages on JUDGE BENJAMIN JONES 300 St. John St. Monroe, LA 71201 *980 PLEASE PERSONALLY SERVE the Original Petition for Damages and the First Supplemental, Amended, and Restated Petition for Damages on JUDGE J. WILSON RAMBO 300 St. John St. Monroe, LA 71201 PLEASE PERSONALLY SERVE the Original Petition for Damages and the First Supplemental, Amended, and Restated Petition for Damages on JUDGE FREDERIC C. AMMAN 300 St. John St. Monroe, LA 71201
*981 VERIFICATION
BE IT KNOWN that on this 31st day of July, 2015, personally came and appeared STANLEY R. PALOWSKY, III, who declared that he is the named plaintiff in the above and foregoing suit and that all allegations contained therein are true and correct to the best of his knowledge, information and belief.
STANLEY R. PALOWSKY, III
SWORN TO and subscribed before me. Notary on the day and date first written above.
NOTARY Sedric E. Banks, Bar No. 2730

The petition alleges that the destruction of documents occurred in 2014, at which time Judge Jones was a duly-elected judge of the Fourth JDC. The petition further asserts that after March 2015, Judge Jones has been employed as the judicial administrator for the Fourth JDC and acts as a "supernumerary" judge.

Additionally, Ms. Campbell and the Judges filed motions to stay discovery until their motions to strike and exceptions could be addressed. Following a hearing on the motions to stay discovery, the trial court granted the motion and stayed discovery pending the disposition of the motions to strike and exceptions. Mr. Palowsky filed an application for supervisory writs with the Court of Appeal, Second Circuit, which application was denied. Mr. Palowsky then sought a writ of certiorari with the Louisiana Supreme Court. The supreme court granted Mr. Palowsky's writ application and, on November 3, 2015, issued a per curiam order directing the trial court to hear the exceptions of no cause of action and the motions to strike, but defer the hearing on the remaining exceptions.

A copy of the First Supplemental, Amended, and Restated Petition for Damages is attached hereto as "Attachment A."

Federal Rule of Civil Procedure 12(f) provides, in pertinent part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Ms. Campbell and the Judges also filed, as part of their motions to strike, requests for contempt and for sanctions. However, the sanctions and contempt requests have been stayed pending resolution of this appeal.

Even though judges may have judicial immunity, this does not preclude litigants from seeking other remedies. See Mireles, 502 U.S. at 10 n.1, 112 S.Ct. at 287 n.1 (where the Court recognized that a judge is not absolutely immune from criminal liability, from a suit for prospective injunctive relief, or from a suit for attorney fees authorized by statute).

Further, because we conclude that the Judges are absolutely immune from suit herein, we pretermit discussion of Mr. Palowsky's fourth assignment of error wherein he contends that the trial court erred in refusing to give him the opportunity to amend his petition to state a cause of action.